## THE L. MARTIN COMPANY

*v.*

## L. MARTIN & WILCKES COMPANY.

[Decided November 13th, 1908.]

1. In a suit to enjoin the use of a corporate trade-name and to recover profits diverted by such use, evidence considered, and held to show that the act of defendant company, in hiring one who had been a member of plaintiff company and placing his name at the head of the former name so as to read L. Martin & Wilckes Company, was with the fraudulent intent to imitate the plaintiff's name, L. Martin Company, and constituted unfair competition.

2. A corporation, apart from statutory provision, has not the right to so use an individual's name, in forming its corporate name, as to imitate a prior corporate name, engaged in the same business, so closely that the public would be deceived; the maxim, *sic utere tuo ut alicnum non lœdas*, applying to everything a man has, including his name.

3. Laws April 21st, 1896 (*P. L. p. 280 ch. 185 § 8*), providing that no name shall be assumed by a corporation already in use by another corporation, or so nearly similar thereto as to lead to uncertainty or confusion, does not merely impose a duty upon the attorney-general of the state, but protects all corporations created under it in the use of their corporate names, and hence an individual name, so used as to imitate a prior corporate name having the same individual name, by which the public are deceived, is within the terms of the statute, and its use may be enjoined.

4. Where it is found that a name adopted by a corporation is so nearly similar to a prior corporate name, both corporations being engaged in the same business, as to entitle the latter to an injunction, the injunction should merely restrain the former from carrying on the same kind of business unless the name be changed so as to clearly and unmistakably distinguish the two corporations and their respective busi-

ness, and it cannot permit the use of the same name with only qualifying words to show that the company is a different one, as the unchanged corporate name would still be deceptive to the public.

5. The court of chancery of New Jersey has general jurisdiction in all cases of fraud, and the only question as to jurisdiction, where there is fraud, is the propriety of exercising the power which the court undoubtedly has.

6. In all cases in which the jurisdiction of the court of chancery, based on fraud, is invoked to obtain purely equitable relief, such as an injunction, the court should proceed to accomplish complete justice and enforce all the complainant's rights arising out of the fraud, including the ascertainment and award of all damages caused by the fraud, unliquidated as well as liquidated.

7. Where a court of chancery has taken cognizance of a suit for unfair competition in the use of a corporate trade-name, in which an injunction is sought as the main remedy, the court may grant the injunction and make an assessment of damages or authorize an accounting for profits claimed to have been diverted by the use of the deceptive corporate name as an incidental relief.

8. Where in an equity suit for injunction to restrain the use of a corporate name similar to a prior corporate name, an award of damages is ordered incidental to the injunction, it is proper in the absence of a request to have the court determine the matter to refer the assessment of damages to a master.

Final hearing on bill, answer, replication and proofs taken in open court.

*Mr. Robert H. McCarter,* attorney-general, and *Mr. Charles L. Carrick,* for the complainant.

*Mr. Craig A. Marsh* and *Mr. Frank P. McDermott,* for the defendant.

STEVENSON, V. C.

The evidence in this case which is very voluminous, in my judgment establishes a plain case of fraud, and an equally plain violation of the complainant's rights in respect of its corporate name vested in it by virtue of the provisions of the eighth section of the Corporation act. *P. L. 1896 p. 280 § 8.* An appeal having been taken from the decree of this court a statement of the "reasons" therefor becomes necessary.

Inasmuch, however, as the complainant's right to injunctive relief, which manifestly was the principal relief for which its

bill was filed, has become an academic question by reason of the abandonment by the defendant of its corporate name, and the substitution of a corporate name which seems to distinguish it and its business from the complainant and the complainant's business, such statement need not be so extensive as otherwise might be deemed necessary. Apart from the question of costs, however, the issue still in litigation between the parties seems to relate solely to the liability of the defendant to account for the damages or diversion of profits which the decree adjudges that the complainant suffered as the result of the defendant's wrong. Of course, the defendant is not liable to account for profits or to pay damages to the complainant unless the defendant's conduct which caused such loss was fraudulent or otherwise illegal. The appeal, therefore, necessarily involves the review of the main issue decided by this court in favor of the complainant establishing the complainant's right to injunctive relief. Nevertheless, in view of the enormous mass of testimony, including exhibits, the probative force of which sometimes can only be determined when presented to the eye, I shall not enter upon an elaborate discussion of the evidence; an outline of the facts will, I think, be sufficient for the purposes of this statement.

On the 10th day of January, 1906, the complainant, The L. Martin Company, and the defendant corporation, then bearing the corporate name of Weglin & Wilckes Manufacturing Company, were two corporations created under the General Corporation act of New Jersey, and actively and competitively engaged in the manufacture and sale of lampblack throughout the United States. Both parties were large manufacturers and dealers in an article (lampblack) proved to be used in large quantities and in a very great variety of businesses. A large portion of the output of each concern is sold in bulk without any special label other than perhaps a brand on the bag. This branch of the trade seems to be carried on directly between the lampblack manufacturer and certain classes of large dealers who buy without regard to any special label, and who do not seem to be liable to make any mistake as to the identity of the manufacturer whose goods they buy. Another large portion of the product is put

into a great variety of packages of various sizes under different brands and labels, upon which packages the name of the manufacturer is printed, and is distributed widely throughout the country and sold for a great variety of purposes.

It appears that from the year 1849 the historic name Luther Martin has been intimately associated with the lampblack business. From that date continuously until the present time the Luther Martins—three of them, father, son and grandson— have been widely known as lampblack manufacturers, under the name of L. Martin & Company, which name has been printed and stamped upon packages of lampblack offered for sale at retail in the market. Although the American manufacturers of lampblack were to a large extent enumerated and described in the testimony, I do not recall that the name "Martin" appeared in any form in connection with any one of them besides the parties to this suit.

In 1886 the original Luther Martin died and his two sons, who were then his partners, and one of whom bore his name, continued the family lampblack business using the same firm name, L. Martin & Company. In 1900 Luther and Robert W. Martin, these two sons, who were still carrying on the lampblack business under the firm name of L. Martin & Co., entered into a consolidation agreement with the Ebony Lampblack Company in pursuance of which the complainant corporation, The L. Martin Company, was created, and succeeded to the business and good will of both the constituent manufacturing concerns so consolidated. The complainant is thus the direct successor to the original firm of L. Martin & Company founded in 1849, and owns the good will of this old established Martin lampblack business.

The defendant, the L. Martin & Wilckes Company, was incorporated under our general act on the 14th day of March, 1901, by a number of German lampblack manufacturers whose names were Weglin or Wilckes. The name of the corporation as set forth in its certificate and with which it began to do apparently a large and successful business, was The Weglin & Wilckes Black Manufacturing Company. The prior history of the business of this company, which extended back, as I recall

the testimony, for a brief period, need not be set forth. The Weg-lin and Wilckes concern soon after its incorporation became large manufacturers of lampblack in this country and sharp competitors of the complainant.

One fact is of great importance, I think, in getting a clear view of the situation of these two rival lampblack manufacturers in January, 1906. By that time the Martin family had to a large extent transferred their interest in The L. Martin Com-pany to the original proprietors of the Ebony Lampblack Com-pany or other persons. In February, 1905, Luther Martin, 3d, a young man about thirty-two years of age, after some years of employment in The L. Martin Company and service as a di-rector, resigned as a director and quit his employment, and after apparently a faint effort to establish some sort of a lampblack business of his own, negotiated a contract of employment with the defendant corporation, The Weglin & Wilckes Black Manu-facturing Company. The written contract of employment which was produced in evidence, bears date March 10th, 1904, and in it Luther Martin, 3d, is described as Luther Martin, and he signs his name in that way. According to the terms of this contract he was employed as manager in the manufacturing de-partment and as salesman of the goods of the defendant corpo-ration "for a period of five years, commencing March 15th, 1904, and terminating March 15th, 1909, at a salary of $1,800 per annum, payable in equal weekly instalments." Young Mr. Martin expressly agrees to give his entire time, skill, &c., to the business of his employer, and agrees specially that he will manu-facture and turn out black of the strength, color and fineness equal to the best black manufactured by any other manufacturer "and fully equal in all other respects and in all qualities to the black now produced by the The L. Martin Company," and he further agrees that said black shall be pure, straight lampblack, and that he will instruct the president of the party of the first part in methods of making the same. The contract further provided for setting aside for Mr. Martin $6,000 of the capital stock of the defendant, and that upon his faithfully carrying out the contract on his part such stock should be transferred to him at the end of the above-mentioned term of five years. Any

violation of the contract by Mr. Martin effected a forfeiture of his right to the stock. The dividends on the stock were payable to Mr. Martin and were guaranteed not to be less than $350 per annum. In the event of Mr. Martin's death at any time after September 15th, 1904, and during his employment, the stock was to be paid to his widow, but the corporation held the right to repurchase the same at par at any time within one year from Mr. Martin's death. In case Mr. Martin fully performed the contract so as to become entitled to the stock, it was agreed that if he desired to sell the same the corporation should have the privilege of buying it back at its par value, $6,000.

There are a number of significant features of this contract, but perhaps the most noticeable one is the very slight interest which young Mr. Martin obtained in the defendant corporation —an interest which was practically controlled by the corporation itself. The Weglin & Wilckes Black Manufacturing Company plainly were seeking to get the knowledge and skill which young Mr. Martin had acquired in the service of The L. Martin Company. It is conceded that they had a right to do this. It is conceded that they had a right to announce to the trade and widely advertise that they had in their employ as the manager of their manufacturing department, the only man by the name of L. Martin or L. Martin, 3d, or Luther Martin, who was actively engaged in the lampblack business if such was the fact. Such a course of procedure may be criticised as being not in accord with the highest standards of ethics or of taste, but the law permits competitors to be coarse and greedy and to do savage things. I think, however, that it is quite plain that when the defendant corporation took this young man in in the manner above described, and proceeded to advertise his connection with its business, it became all the more necessary that it, the defendant corporation, should scrupulously avoid any simulation of the complainant's business which might have the effect to deceive purchasers and users of lampblack and injure the complainant.

In the fall of 1905 the $6,000 of stock appears to have been transferred to young Mr. Martin, and the papers were drawn to effect a change of the corporate name of the defendant from The Weglin & Wilckes Black Manufacturing Company to "L.

Martin & Wilckes Company." I think young Mr. Martin had previously become a director and a vice president of the company.

The certificate effecting the above-mentioned change of name was filed on the 10th day of January, 1906, and thereafter until the recent second change of corporate name above referred to, made by the defendant corporation, these two great competitors in the manufacture and sale of lampblack carried on their business under the names respectively of The L. Martin Company and L. Martin & Wilckes Company. In these days of consolidations, inasmuch as it was widely known throughout the country that there had been an old and successful lampblack business of high repute carried on for fifty years under the name of L. Martin & Company, it seems to be evident from the mere statement of these two names that there was a high degree of probability, if not practically a certainty, that numerous purchasers and users of lampblack—buyers, for instance, of a ten-cent package at a grocery or paint store—would infer, upon seeing the name of L. Martin & Wilckes Company that the corporation bearing that name had succeeded by consolidation or otherwise to the original Martin lampblack business and good will, and that the package so purchased bearing the Martin name had back of it the qualities and reputation of the well-known Martin lampblack. The two competitors were dealing with articles which in many important respects were necessarily similar in appearance and in characteristics. The name "Germantown" as a sort of mark or designation used on packages of lampblack is admitted to have been common property among all lampblack manufacturers. The course of business pursued by both these concerns in the way of advertising, packaging and distributing their products, present many similar features and thus make confusion arising from the use of the name L. Martin in each of their corporate names more liable to occur. That confusion in fact was created to the annoyance and injury of the complainant, I think, was sufficiently proved. A very large manufacturer of paints and chemicals, Mr. Robert S. Perry, was sworn on behalf of the defendant to testify that there was no possibility of any confusion in the business of the two corporations arising from their

similarity of name. This witness, however, seemed to refer to large purchasers of lampblack in bulk like his own firm or corporation. The witness frankly admitted that such direct dealers with the defendant corporation would be saved from confusion only by their knowledge of the continued business activity of the old Martin concern under the name of L. Martin & Company. This testimony strengthens the position of the complainant that the purchasers of lampblack in packages who find it on shelves in the shops all over the country, bearing the name of the defendant corporation, in large numbers of instances, would probably infer that the goods before them were manufactured by the successor of the old manufacturing concern, which for so many years went under the name of L. Martin & Company.

All the inferences leading to the conclusion that the assumption of this new name by the defendant corporation was a fraud, injurious to the complainant, are sustained by a mass of testimony, which from its form, variety and minuteness of detail requires for elucidation the exposition of counsel, which was made before this court on both sides in a most ample and satisfactory manner. Without undertaking to set forth this testimony it will, I think, be sufficient to state the main conclusions which I have reached in this case.

1. No honest purpose for changing the corporate name of the defendant so as to appropriate the name L. Martin as a part of it has in my opinion been suggested by the testimony. Let it be conceded that the defendant corporation in its competition with the complainant corporation had an unlimited right to advertise to all purchasers of lampblack that it (the defendant) had in its employ the only man named L. Martin who was connected with the manufacture of lampblack, and that he had learned his business with the original L. Martin Company. Let it be conceded that defendant's corporate name might be changed so as to advertise these facts, provided no fraud or confusion injurious to the complainant was effected thereby. It seems unnecessary to consider under what limitations the corporate name of the defendant might have been employed in the manner and for the purpose above indicated because Mr Felix

Wilckes, the president of the defendant company, one of the original founders of its business, and one of its largest stockholders, who was thoroughly conversant with all the transactions which resulted in the change of the defendant's corporate name, testified that in making such change they did not have in view that thereby there would be a wider publication of the fact that the defendant had the advantage of the L. Martin name and the L. Martin skill. The witness repeated that that result was not in view at all.

I shall not undertake to discuss the very considerable mass of testimony about a dinner which was held by the officers and customers of the defendant some time, I think, in or about January, 1905, in which it was suggested that young Mr. Martin should be recognized by having his name introduced into the business of the defendant. It is, I think, impossible to believe that these keen, aggressive business men who apparently have large experience in the markets and have other business ventures on their hands, would have made this change in their corporate name from the sentimental motives applied to them upon the occasion of this dinner. The change, in fact, was not made for about a year. When the change was made, young Mr. Martin had no business and no good will of any business. Only a few weeks at most had intervened between his withdrawal from the employ of the complainant corporation and his successful negotiation for employment with the defendant corporation. I do not recall any testimony that young Mr. Martin in that brief period did anything in the way of business except possibly to have a label printed preparatory to embarking in the lampblack business at Germantown. During all of his business life until he left the employ of the complainant, he had been identified with the business of the complainant and had no good will of his own, and he had acquired none when he merged himself in the Weglin & Wilckes Company in March, 1904. Why should these two manufacturers, the Messrs. Wilckes, after the Weglins had withdrawn and gone back to Germany, so as to make a change of the corporate name proper and necessary, place this young man's name at the head of their own so as to constitute it the most prominent and distinctive part of their corporate title?

He was with them under a five-year contract, after which period he might be turned out. He might be discharged at any time for violation of his contract, or he might die or become incapacitated. The Messrs. Wilckes had a very large investment in this lampblack business. Out of nine hundred and two shares of stock outstanding each brother held four hundred and twenty shares, representing in the aggregate $84,000. The remaining stock outstanding consisted of two qualifying shares, and the sixty shares which the Messrs. Wilckes had transferred to Mr. Martin. It does not appear that the transfer on the books of these shares in the fall of 1905 practically affected the control over them which the Messrs. Wilckes had under the terms of Mr. Martin's contract of employment.

We have then a large and apparently permanent business almost wholly owned and exclusively controlled by the Messrs. Wilckes, while the connection of young Mr. Martin with that business was based upon a very slight interest, and was necessarily extremely uncertain in respect of its duration. Is it possible to believe that the Messrs. Wilckes made this permanent change in the name of their corporation from a kindly desire to gratify this young man whose personality was liable to disappear from their business at any time? Is not the inference unavoidable that these shrewd men intended permanently to incorporate the name of L. Martin in the name under which their large and expanding business would be conducted in order to appropriate to themselves the permanent benefit of the name L. Martin in the lampblack business? If young Mr. Martin at the end of a period of two or three years, during which this L. Martin & Wilckes Company had been advertised all over the country as lampblack manufacturers of high repute, had died or been discharged for dishonesty, can it be doubted that the Messrs. Wilckes, the defendant corporation, would remain permanently in the possession of a very valuable thing? The Messrs. Wilckes changed the name of their corporation with such possibilities plainly in view. Can there be any doubt that when contemplating such possibilities they had no intention in case young Mr. Martin was eliminated from their lampblack business to have his name eliminated from their corporate name as well?

A great deal of testimony was taken in regard to the very significant change which young Mr. Martin made in his own name after he left the employ of the complainant. The testimony satisfactorily proves that young Mr. Martin originally was uniformly known as L. Martin, 3d, or perhaps, occasionally, Luther Martin, 3d, and that he so signed his name. His father was known as L. Martin, Jr., or Luther Martin, Jr., notwithstanding the fact that the first Luther Martin who appears in the testimony died in 1886. When young Mr. Martin associated himself with the defendant corporation, he seems to have resolved upon changing his name. In the latter part of 1895 we find him signing his name in letters addressed to The L. Martin Company and to the Philadelphia Trust Company, where his stock was pledged, as L. Martin, 3d—the name by which these correspondents knew him. We also find during the same period that he signed his name as L. Martin when carrying on the correspondence of his employer with its customers. When the business of changing the defendant's corporate name was finally entered upon, the young man's name was accepted as L. Martin, and that name appears in the most prominent place in the new title of the corporation. Assuming for the mere purpose of the present discussion that the defendant corporation would have an absolute right to put the name of this young man, whose connection with their large business was so slight and possibly transient, at the head of their corporate name, without the slightest regard to the fact that such form of corporate name would lead to uncertainty and confusion or deception to the injury of the complainant, what possible justification can be offered for incorporating this young man's name in an altered form—a form in which it had not been known, but which manifestly simulates the name of the defendant corporation and the name of the Martin lampblack business to which the complainant had succeeded? In my opinion in order to find that the defendants were innocent of any intent to fraudulently appropriate the name and good will of the original Martin lampblack business which belonged to the complainant, we must disregard sound rules of evidence, all experience with the motives which influence human nature and common sense.

4

2. The idea that a man has a right to use his name as a part of the name of a corporation in which he is interested, without regard to the effect of such use in the way of accomplishing deception and fraud, precisely as a natural person can use his own name, has, I think, in this state, been exploded. The opinion of Mr. Chief-Justice Fuller in the case of *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict, 198 U. S. 119; 49 Law Ed. 972, 985,* so far as it negatives when properly interpreted the proposition that the use of a family name by a corporation stands on a different footing from its use by individuals or firms, is, I think, inconsistent with the unanimous opinion of the court of errors and appeals in this state in *International Silver Co.* v. *Rogers Corporation, 67 N. J. Eq. (1 Robb.) 646.*

I think we have got beyond the notion, if it ever prevailed, that a man has an absolute right to use his name in his business shutting his eyes to the inevitable effect of such use to deceive the public generally, and to injure some other dealer in the market. The maxim *sic utere tuo ut alienum non lœdas* applies to everything that a man has, including his name. Confusion seems to have sometimes arisen from the failure to recognize the difference between the name with which a man finds himself encumbered and, perhaps, cursed, when embarking in business, and which perhaps to a very large extent he is practically obliged to use in such business, with the name of a corporation which he creates for the purpose of carrying on his business. He is not responsible for his individual name—had no choice in its selection; he is wholly responsible for the corporate name, having had a wide field within which to make any selection as he might see fit.

Confusion between two natural persons who are doing business under the names their parents wisely or unwisely gave them, generally may be regarded as an accident, a misfortune to both, but neither is to blame for the harm that is done. Two men having the name John Smith in common might be engaged in the same line of business in the same town. Certain special duties may be cast upon each, growing out of this sameness of name and business. Neither one, however, can compel the other to abandon his name or carry on his business under a different

name. Suppose, however, an old established lampblack manu-
facturer named John Smith, carrying on his business in his in-
dividual name, should incorporate his business under the name
of The John Smith Lampblack Company. Is it not clear that
no other John Smith could thereafter embark in the lampblack
business and carry on the same under the same corporate name?
Under our present Corporation act the second John Smith could
not create a corporation with such a name.

3. Apart from the general equitable principle which limits a
man in his use of his name as a part of the corporation which
he creates for carrying on his business, our statute, it seems to
me, recognizes a right in every corporation under our general
act to be protected against the evils of "uncertainty and confu-
sion" which arise from the adoption of a similar name by a
subsequently created corporation. *P. L. 1896 ch. 185 § 8.*

I do not think that the object of this provision of our Cor-
poration act was merely to impose a duty upon the attorney-
general of the state. It seems to me that one object of this
statute was to protect all corporations created under it and to
safeguard the use of their corporate names in their business.
What similarity must be deemed as leading to "uncertainty or
confusion" must depend upon circumstances. An important
test oftentimes will be found in the objects of the corporation
set forth in its certificate. A John Smith company carrying on
the lampblack business in Camden might have no possible com-
plaint against a subsequently created J. Smith company carrying
on the lumber business in Paterson, the objects of the two cor-
porations being set forth in their respective certificates. A
change of business or a change of location might bring two cor-
porate names, which originally passed the statutory test, subject
to the operation of the equitable rule which existed independ-
ently of and prior to any statute.

In the present case, however, I think the complainant's right
to relief, both through an injunction and a recovery of damages
or diverted profits, rests firmly upon the great equitable principles
which do not depend upon the above-mentioned statute. The
statute, however, seems to be utterly inconsistent with the idea
that the names of corporations on the one hand, and the names

of individuals and firms on the other, stand on the same footing in cases of unfair competition. Apart from any question of actual fraud every man is bound to recognize the prior right to a corporate name which has been acquired under our statute. No man has an unlimited right to use his own name in the creation of a corporation under our statute. Any incorporation under our law is a privilege which must be accepted under the conditions imposed.

4. The injunction which the complainant was allowed to issue in this case does not restrain the defendant from doing any business under its present corporate name. Under its present certificate or under an amended certificate it might carry on a business entirely different from the lampblack business without causing any deception to the public or injury to the complainant. It is not suggested that the "L. Martin & Wilckes Company" might not carry on the business of manufacturing silk fabrics or steel rails without defrauding or annoying the complainant, by the introduction of uncertainty or confusion into its business. The injunction will, therefore, merely restrain the defendant from carrying on the lampblack business under a name of which the words "L. Martin" are a part, unless other words are made a part of such name which will have the effect to clearly and unmistakably distinguish the two corporations and their respective businesses. Counsel for defendant in his brief suggested that the injunction should be so drawn as to permit the defendant to use its present corporate name "coupled with such other words as would unmistakably distinguish it from the defendant." Counsel suggested the phrase "not connected with The L. Martin Company, our competitors," as a proper form of language to be employed "in connection" with the defendant's present corporate name. These suggestions are based upon the opinion of the court of errors and appeals in the *Rogers Case.*

The difficulty about permitting the defendant to continue to use its present corporate name in the lampblack business arises from the fact that although the defendant may connect other words with its corporate name, the public may not. The situation is radically different from that which was present in the

*Rogers Case.* There the question related to the stamping of the goods or the name of a label or advertisement describing the goods. In order to get the benefit of the principle which the defendant invokes, it is necessary, I think, that the suggested curative phraseology be actually inserted in and made a part of the corporate name. Only in this way can the defendant corporation be with certainty identified and distinguished from the successor to the old business of L. Martin & Company. No practicable way was suggested by which the name L. Martin could be employed as part of the defendant's corporate name without creating liability of injury to the complainant. Counsel for the defendant was allowed on settlement of the decree to further argue this question and to submit a form of corporate name for the defendant in which the name L. Martin or L. Martin, 3d, might appear without injury to the complainant's rights. It seems to be conceded that such a form of corporate name is impracticable.

5. After the announcement of the conclusions substantially set forth above, extensive argument was made in regard to the right of the complainant to an accounting from the defendant. The conclusion which I reached in regard to this matter is set forth in the following memorandum heretofore furnished to counsel:

The gist of the complainant's case lies in a charge of fraud against the defendants. The court of chancery of New Jersey has general jurisdiction of all cases of fraud. The only question as to jurisdiction where there is fraud is confined to the propriety of exercising the power which the court undoubtedly has. The cases decided in this court and the court of errors and appeals sustain the wide theory of equity jurisdiction in New Jersey in all cases of fraud which has prevailed in England. *Eggers* v. *Anderson,* 63 *N. J. Eq.* (*18 Dick.*) 264; *Hubbard* v. *International Mercantile Agency,* 68 *N. J. Eq.* (*2 Robb.*) 434; *Dawson* v. *Leschziner,* 72 *N. J. Eq.* (*2 Buch.*) 1; *Mazzola* v. *Wilkie,* 72 *N. J. Eq.* (*2 Buch.*) 722. It follows that where the complainant is found to have brought his case properly in the court of chancery of New Jersey for equitable relief based on fraud, and the court has administered a portion of the relief

to which he is entitled, he ought not to be turned out of the
court of equity and compelled to try his case all over again in
a court of law in order to have his damages awarded to him.
Assuming that this tort, called unfair competition, which is so
peculiarly the creature of courts of equity, is cognizable at law
in an action of trespass on the case, it may be that the court of
chancery would not entertain a bill in this case, the sole object
of which was to give the complainant damages which he had
suffered on account of the defendant's fraud. If such a bill
were presented, the court of chancery, while asserting its theo-
retical jurisdiction might decline to exercise it on the ground
that the complainant had an adequate remedy at law. Right
here, it seems to me, comes the distinction between the award
of damages in a fraud case and the award of damages in a nui-
sance case where an injunction goes. Without a Lord Cairnes's
act the court of chancery is powerless in a suit in which an in-
junction upon a nuisance is granted to go on and assess the
damages which the complainant has suffered from the nuisance.
Most jurists, I think, in these days agree that this is a deplor-
able result, and that Lord Cairnes's act effected a useful reform.

The general rule, to which perhaps there may be exceptions,
in my opinion, may be safely laid down that in all cases in
which the jurisdiction of the court of chancery based on fraud
is invoked to obtain purely equitable relief such as an injunc-
tion, the court should proceed to accomplish complete justice
and enforce all the complainant's rights arising out of the fraud,
including the ascertainment and award of all damages caused
by the fraud, unliquidated as well as liquidated. It may be
noted that the present case does not call for the application of
such an extreme rule. It has not so far been suggested that the
complainant has suffered any substantial damages from the
fraud of the defendant other than the diversion of profits. The
defendant presumably has received or will receive these profits
fraudulently diverted from the complainant, and the theoretical
"fund" to which Professor Pomeroy refers (*1 Pom. Eq. Jur.* §§
*170, 175*), and which was thought to help out the jurisdiction of
a court of equity to award damages, may perhaps be assumed to
exist. The extreme rule above indicated would be applicable

in case the complainant claimed damages (unliquidated, of course), because of the conduct of the defendant in supplying the market with inferior or defective goods, which would be attributed by the purchasing public, or some part of them, to the complainant, whereby the complainant's reputation in the market had suffered. No such damages have been claimed in this case, but if they were I would not hesitate to hold that the jurisdiction of the court of chancery to award such damages exists in full force and should be exercised, the complainant having necessarily come into the court of chancery for the most important part of the relief to which it was entitled, viz., injunctive relief. Of course the court might obtain the aid of a jury in assessing the damages if in its judgment such aid would be valuable. The defendant, however, has no constitutional right of trial by jury because the court of chancery has complete though concurrent jurisdiction of fraud cases.

The effect of extending the jurisdiction of courts of equity by statutes like Lord Cairnes's act, and of extending the jurisdiction of courts of law by statutes giving them cognizance of equitable defences, and giving them power to issue injunctions upon our dual system of law and equity, has I think, oftentimes been misunderstood. To some minds the separation between the administration of law and the administration of equity is imperiled when the court of law or the court of equity in which a particular case happens to be pending is permitted to recognize and enforce all the rights of the parties litigant, whether legal or equitable, and to award all remedies which either a court of law or a court of equity can supply. This sort of merger of law and equity in particular cases has been firmly established under the modern English practice for many years without in the slightest degree impairing the value of the dual system. The reason is plain. The vast majority of disputes between litigants can be completely disposed of in a single civil action either in a court of law or in a court of equity. Day after day our two systems of courts are at work, each within its appropriate sphere. Our judges are trained and become expert in that particular kind of work which is allotted to their respective courts. The full advantage of the application of the prin-

ciple of the division of labor to judicial work is obtained by the natural and necessary classification of the vast majority of all civil actions, as actions at law or suits in equity, and the allotment of these classes to their respective courts. When, however, the exceptional case appears and the enforcement of all the rights of the parties litigant so as to accomplish complete justice between them in a particular case necessarily involves the application of both law and equity, it certainly seems to be better to allow an exception to the general rule. Justice, convenience and common sense should not be sacrificed in order to maintain a rigid remedial system. In New Jersey we believe in the so-called separation of law and equity, because we think that such separation leads to the evolution of better law and better equity, to the training of better law judges and better equity judges than is possible under a system which compels every trial judge to be expert in all branches of judicial work. But the separation of which we approve ought not to include the splitting of a cause in two and the trial of the two portions in different courts. If the great majority of litigations were both legal and equitable in their nature, in my opinion the dual system would be an intolerable evil.

After trying a nuisance case for three or four days and granting an injunction, it gives me no satisfaction, but, on the contrary, somewhat shocks my sense of justice to refuse to hear the complainant's appeal for his damages, and to require him to bring an action at law involving perhaps three or four days of trial in order that his damages may be assessed by a jury. In all cases in which only a court of equity has the power to administer an important part of the relief sought by the complainant, I think it ought to be astute to find a way by which it can go further and administer the rest of the relief to which the complainant is entitled, but which ordinarily he could obtain only in a court of law. A similar statement, I think, can justly be made with reference to any possible corresponding action on the part of a court of law in the way of administering complete relief by exercising not only its own legal jurisdiction but also in the particular case the jurisdiction of a court of equity.

It may be noted in passing that the proposed constitutional amendments now before the legislature of the state provide for the "giving of complete legal and equitable relief in any cause in the court or division where it may be pending."

6. A reference to a master in order to assess the complainant's damages was made in this case because counsel on both sides assumed that such a course would be taken if an accounting of any kind should be ordered. In many cases of this class probably the better method is to have the court try and determine the issues in regard to the nature and amount of damages to be awarded precisely as the other issues in the cause are tried. No application having been made to have the damages ascertained by the court in this manner, the old and well-settled method of conducting an assessment of damages or an accounting for diverted profits was followed in the decree. The decree, therefore, directs that an injunction issue in the form above indicated and that complainant's damages be assessed by a master.