A. Hollander Son, Incorporated, a corporation, complainant, Jos. Hollander, Incorporated, a corporation, and Joseph Hollander, defendants, are engaged in a business where both corporations receive raw skins or furs from others, subject these skins or furs to certain skilled processes and thus produce finished furs for conversion into wearing apparel.
This suit is brought to enjoin the defendant corporation and Joseph Hollander from using the name "Hollander" either alone or as a component part of any trade name in the business of dressing and dyeing furs; using the letter "J" in connection with the name "Hollander;" using the name "Hollander" and the letter "J" in such form or manner as may tend to confuse in the mind of the buying public or ultimate consumers the identity of the respective products of the complainant and defendant, or in the alternative, should the court permit the defendants to use the name "Hollander" they be enjoined from using same except in conjunction with the name "Joseph" fully written out and in such form and manner as will give to the name "Joseph" the same prominence and significance as will be given by the defendants to the name "Hollander" in all their advertising literature and matter, and for such other and further relief as may be just, and agreeable to equity and good conscience.
The proofs disclose that complainant's business was founded some forty-five years ago by Adolph Hollander (now deceased), the father of Harry Hollander (now deceased), Michael Hollander and Benjamin W. Hollander, the latter two named now being the president and treasurer respectively of the complaining corporation. Adolph Hollander *Page 308 
was a brother of the defendant Joseph Hollander. The testimony is conflicting as to whether Adolph Hollander possessed skill in dyeing and dressing of furs prior to 1883, but that fact is of no moment since prior to 1889 neither Adolph or Joseph was in business under the name "Hollander," both having been employed by others. Commencing with 1889 and down to 1896 the brothers Adolph and Joseph did business under the trade name and style of "Hollander Bros.," and the name, therefore, during that period meant no more to the one than to the other. That firm failed of success and in 1896 Joseph sold his one-half interest for $2,000 and covenanted not to engage in the fur business for ten years. Thereafter Joseph was engaged as a saloonkeeper until 1906, from then for two or three years in a fur business which failed, and later from 1910 to 1918 as a salesman for A. Hollander Son, the firm to whose business the complainant succeeded by purchase in 1919. While so employed Joseph Hollander was an "outside" man, soliciting orders, and had nothing to do with the technical work in the factories. Whatever value the name "Hollander" had acquired up to 1896, the time Joseph Hollander sold his interest in the firm of Hollander Bros., was part of the good will of the firm, and became the property of Adolph Hollander and his son, Harry, when they bought the interest of Joseph.
Adolph and his son, Harry, in 1896, formed a partnership known as A. Hollander Son, later admitting Michael, Benjamin and Albert Hollander into the firm. In the ten years following Joseph, as agreed, did not engage in the fur dressing and dyeing industry and no other "Hollander," according to the proofs before me, was engaged in this country under his own name in that industry.
In 1919 the then members of the firm of A. Hollander Son incorporated the complainant company and sold to that company the firm's entire business consisting of its factories and its machinery, equipment, good will and the exclusive right to the use of the trade name of A. Hollander Son.
During the years intervening, the foundation for the reputation of A. Hollander Son was built to the extent of where *Page 309 
it now enjoys world leadership in its chosen field, because of the superiority of its product in color, finish and durability, accomplished by years of experimentation in secret recipes, formulae and methods as well as improved and advanced factory efficiency and management. This superiority of product is recognized in this country and abroad by dealers and manufacturers and also by the ultimate users; the proof being that women shoppers for fur garments inquire whether the fur was dyed by "Hollander's," having learned from dealers or through the dealers' extensive advertising or the advertising indulged in by the complainant or by personal experience that the furs processed by A. Hollander Son give superior service and satisfaction. The phrase "Hollander Dyed," the evidence shows, was understood by dealers, manufacturers and ultimate users as designating and identifying the fur products of complainant. No other Hollander competing, the name when used in connection with fur skins or fur garments, was understood and taken to mean furs dressed and dyed by A. Hollander Son.
Albert D. Williams, president of J.D. Williams, Incorporated, fur dressers, whose business has been operated continuously for one hundred and seventeen years past, says, "for many years prior to 1921 and ever since that year the products of the complainant, A. Hollander Son, Incorporated, acquired and have continuously enjoyed fame for quality and leadership and are known throughout the country by the name `Hollander' or `Hollander Dyed.'" The president of Chapal Freres, Henry J. O'Toole, whose business was founded in France over a hundred years ago, and in this country in 1883, testified to complainant's activity in the field of Hudson seal prior to 1918 and says that when in that year Joseph Hollander, the defendant, commenced doing business he was unknown to the trade as a dresser or dyer but known only as one of the salesmen for A. Hollander Son, and that he enjoyed neither fame, reputation or background as a practical dresser or dyer.
Mr. Cohen, recently retired as a manufacturer of fur garments in New York City, and in which business he had been *Page 310 
engaged continuously for forty years, says that complainant has been recognized as "the leader in the fur dressing and dyeing field, particularly with respect to its Hudson seal product;" women buyers of fur garments would ask for "Hollander Dyed" skins; that the phrase acquired and retains a decided secondary meaning in the trade; that "Hollander" and the words "Hollander Dyed" commonly signify skins treated at complainant's factories. That prior to 1918 the name "Joseph Hollander" carried no significance in the fur industry for dressing or dyeing ability, reputation or background.
Hudson seal is one of the principal items of product of both complainant and defendants, and was unknown in this country, according to the evidence, prior to 1908, except as it was imported from France. In 1908 J.D. Williams, Incorporated, and Chapal Freres commenced to produce Hudson seal in this country. In the year 1913 A. Hollander Son entered the field and has ever since produced Hudson seal. It was not until the year 1917 that J. Hollander Company, which corporation was organized by Jacob Hollander, son of the defendant Joseph Hollander, and who until that time was employed by A. Hollander Son, also embarked upon the production of Hudson seal in Brooklyn, but its business lasted for only three months when it was taken over by A. Hollander Son. The next competitor to appear in the market was J. Hollander Son, the defendant, in the year 1918, up to which time, the evidence satisfies me, Joseph Hollander possessed neither skill nor reputation as a dresser and dyer of skins. He was a salesman and so recognized by complainant and the fur trade generally.
According to the evidence, when the complainant came out with its Hudson seal product in 1913, Chapal Freres was extensively advertised as "Hudson Seal, Chapal Dyed." The complainant's pelt was stronger and more pliable and, therefore, less subject to deterioration from cracks and breaks, a fact which was brought to the attention of the consumer by the retailer, with the result that the Hollander product became popular and the name Hollander came to denote *Page 311 
excellence in quality. Such was the situation in the Hudson seal market in 1918 borne out by the evidence. Complainant's then chief competitors, J.D. Williams, Incorporated, and Chapal Freres, admit the leadership of the complainant in the field of Hudson seal during that period.
When the defendant company was incorporated on June 3d 1918, under the name of Joseph Hollander Son, Michael Hollander, president of the complainant, objected to the use of the name "Hollander," insisting that defendant's business be carried on under some name of which "Hollander" would not be a component part. Conferences were admittedly held at the office of counsel for the complainant at which the defendant corporation was threatened with an injunction against the use of the name Hollander. What transpired at these conferences is in dispute. I gather from the evidence that the principal objection on the part of complainant to the use of the name Hollander by the defendant corporation was that confusion would result among the consumers who intended to buy complainant's product, the defendant Joseph Hollander, taking the position that no confusion could arise since the business of both companies was then being done with fur dealers and manufacturers only, no sales being made direct to the consuming public and the dealers and manufacturers knowing the two concerns would and could differentiate between them. Briefly, the result of the conferences was that the corporate name of the defendant by amendment of its charter was changed to "Jos. Hollander, Inc.," and the new corporate name repainted on the trucks of the company and new stationery and literature procured with the new name, and the expense incident thereto paid for by A. Hollander Son. Although the court asked the defendants to explain the inclusion by them in the first instance of the words " Son" in the defendant's corporate name, no satisfactory explanation was furnished. In the course of the oral argument the court asked counsel why, if the defendant's name had been lawfully selected, it was so promptly amended on the objections of A. Hollander Son. Counsel's explanation was that the change was made by the *Page 312 
defendants only because it was requested by A. Hollander Son. In the brief subsequently furnished counsel argues that in 1918 when Joseph incorporated his company objection was made to the use of the words " Son" and then says "there was some merit in the objection since complainant had just purchased the business of Joseph Hollander's son, Jack." The inclusion by the defendants in 1918 in the corporate name of the words " Son" impresses me as an attempt by them at the very launching of their business enterprise to simulate the already well known name of A. Hollander Son and by such simulation unlawfully to reap custom and advantage. The mere fact that the effort was abortive, being promptly objected to by Michael Hollander and suit threatened, does not change the complexion of the defendants' act. It evinces a fraudulent state of mind ab initio and seriously affects the credibility of Joseph Hollander's testimony concerning the events of 1918.
Under the proofs in the case the complainant at that time could have successfully maintained a suit for injunctive relief. O. W. Thum Co. v. Dickinson, 245 Fed. Rep. 609, andInternational Silver Co. v. Wm. H. Rogers Corp., 67 N.J. Eq. 646; 72 N.J. Eq. 933; L. Martin Co. v. L. Martin Wilckes Co.,75 N.J. Eq. 39 (reversed on question of damages, otherwise approved, Ibid. 257). Complainant, however, further relied upon the assurance which I find from the evidence was given by the defendant that it would not enter the field of ultimate consumption but would limit its activity to the trade, consisting of dealers and manufacturers, for the fact is that from 1918 until 1933, the defendant refrained from reaching out to the ultimate consumer world with the exception of a few isolated and unimportant instances, not brought to the attention of complainant's officers. In 1918 the complainant's name and its product had already attained fame and reputation, and it was natural for complainant to be concerned about another competitor with the same name, "Hollander," particularly should that competitor address itself to the field of ultimate consumption, where discriminate observation is unlikely and confusion and mistake probable. *Page 313 
Complainant for sometime indulged in extensive advertising in which advertisements it employed various symbols, and which advertising it continued down to the present time. In the year 1933 defendant began to simulate the form and type of complainant's advertising matter in periodicals and literature and held itself out as "the pioneer Hudson seal dyer" with "a background of forty-five years' experience" and represented its product to be "Hollander dyed" without indicating that such product was dyed by the defendant company, and in other respects simulated complainant's advertising in most of which, if not in all, the defendant's corporate name, Joseph Hollander, Incorporated, did not appear, but instead thereof the letter "J." was used instead of the full name Joseph. In those instances where the true name of the defendant company does appear, that name loses its significance in the presence of the name "Hollander" or "J. Hollander" also appearing in larger and more pronounced type and more striking formation. All that is needed is to compare the numerous exhibits, introduced by both parties, to be profoundly impressed with the fact that the defendants were playing up the name "Hollander" and throwing into obscurity the name Joseph. Such a comparison also clearly reveals the simulation by the defendants of the complainant's advertising matter in general form and style and, in at least one instance, in color selection. It is also quite apparent that the defendants' invasion of complainant's advertising style and methods was of a progressive sort, growing bolder as the months went on. It is significant that this conduct commenced shortly after the defendants' advertising activities were put into the hands of a Mr. Hedler, who for a number of years and until June of 1933, had been one of the active managers of complainant's advertising projects and who was fully informed of the details of complainant's contemplated national advertising campaign to be addressed to the millions of women who constitute the consumer market for furs in this country.
These acts and conduct of the defendant followed the inauguration of a campaign of national advertising on the *Page 314 
part of the complainant of its product in order to bring the same directly to the notice of the ultimate user and consumer commenced by it in the month of February, 1933, which campaign of advertising involved a cost of over $100,000. Prior thereto complainant had not extensively advertised its product to the consumer, confining its advertising matter largely though not wholly to trade journals and publications circulating among dealers, jobbers and manufacturers. In the fall of 1933, complainant through its counsel complained of the defendant's conduct in simulating its advertising matter and its symbols and the discontinuance by it of the name "Jos." Hollander, Incorporated. Conferences again followed between counsel for complainant and the defendant at one of which such conferences Julian A. Cohen, vice-president and treasurer of the defendant company, and Mr. Jack Stubins, vice-president and sales manager, suggested to Mr. Samuel F. Leber, complainant's counsel, that if the complainant company would abandon its advertising campaign directed to the consumer, the defendant company would abandon using the letter "J." and would thereafter use the name "Joseph" instead of such letter "J." in all of its advertising. Nowhere in the proof does the defendant deny this suggestion on the part of its officers, wherefore I am constrained to the conclusion that the purpose of the defendants in simulating and imitating the advertising campaign of the complainant was to reap for itself the benefit of the name, fame, reputation and prestige of complainant in the sale of its product and to deceive and mislead the ultimate consumer. Defendants undoubtedly also realized that the use of the letter "J." in connection with the name "Hollander" is not such a differentiation from the name "A. Hollander" in the mind of the ordinary and unsuspecting consumer that here, too, it might reap and obtain for itself the benefit of complainant's name, fame, reputation and prestige in the sale of its own product. The defendant's corporate name was "Jos." Hollander, Incorporated. Why then advertise "J." Hollander, Incorporated? Was it because "A" and "J" when pronounced sound almost the same? There was a purpose and it was to filch the custom *Page 315 
and trade of complainant. The change was unnecessary, and where such selection of a name for advertising is made unnecessarily, or for the purpose of illegitimate competition (I hold it was both), the use thereof should be enjoined. Baker v. Baker,115 Fed. Rep. 297.
In its advertising matter the complainant employed the symbol of a Dutch boy which it registered as a trade-mark. Defendants do not deny the use of the Dutch boy symbol for advertising purposes, except to say that it bore no resemblance to complainant's Dutch boy. Comparing the two is all that is necessary in order to arrive at the conclusion that the purchaser might easily be deceived since it is not likely that he would have both exhibited to him for the purpose of discrimination and distinguishment. All of these matters and things, when taken in connection with the simulation of the advertising matter of complainant, evince a studied design on the part of defendant to mislead the consumer public. "Similarity, not identity, is the usual recourse where one party seeks to benefit himself by the good name of another." Celluloid Manufacturing Co. v.Cellonite Manufacturing Co., 32 Fed. Rep. 94; Bayuk Cigars,Inc., v. Fine, 112 N.J. Eq. 166; affirmed, 114 N.J. Eq. 83.
When the defendants commenced business in 1918, I have no doubt that the complainant would then have been entitled to an injunction prohibiting the use of the name "Hollander" in any manner or form, and the individual, Joseph Hollander, could then have been enjoined from using the name Hollander except with "Joseph" as an immediate prefix with the words following "not connected with the original A. Hollander Son." And this under the authority of International Silver Co. v. Rogers, 72 N.J. Eq. 933.
Whether complainant's rights and the defendants' liability found to have existed in 1918 are different now, in other words, whether complainant has lost its right to relief because of the lapse of time or conduct on its part by way of acquiescence is the question which now presents itself. Is the complainant barred from the relief now prayed because of acquiescence and laches? The defendants so contend. *Page 316 
It does not seem to be denied on the part of the complainant that it consented to the use of the name "Hollander" as a component part of the defendant company's corporate name upon the assurance that "Hollander" would only be used in connected with the name "Joseph" and then only in dealing with fur dealers and manufacturers, that is to say, with the trade and not with the ultimate user and consumer. The defendant observed its assurance in this respect until about the year 1929 when it adopted the letter "J" but only, so far as the evidence shows, within the limits of the trade until the fall of 1933. It seems to be conceded by the parties to this suit that in the trade as distinguished from the consumer the letter "J" was not misleading or confusing. There it was well understood and the trade readily distinguished between complainant's product and that of the defendant's. Toward the latter part of 1933 and from thence forward defendants directed their attention by advertisement and literature to the consumer field using the name of "J. Hollander" and "Hollander Dyed." The protest as evidenced by the correspondence and conferences held immediately following shows persistent objection and no acquiescence in the breach of the understanding. It is contended by the defendants that complainant's failure to proceed in 1918 against defendants for injunction against the use of the name Hollander amounted to a contract between the parties. That cannot be so if for no other reason than for lack of consideration. Certainly the assurances then given by the defendants could constitute no consideration since the defendants were bound by law to refrain from doing that which they agreed not to do. Again, if upon some theory of law which has not been mentioned by counsel or which I have not perceived, the defendants could be said to have furnished some consideration when they gave their assurance that they would not use the name Hollander other than with the trade, then the proof shows that that consideration has since failed. Moreover, the consent then given by the complainant as I understand the decisions upon the subject can be considered to be nothing more than a revocable license which could last no longer than the approval from which it sprang. *Page 317 
The defense is that of laches and acquiescence. "The law relating to fraudulent or unfair competition between traders is so firmly established and has been so lucidly illustrated and defined by the courts of England and of this country, that extended citation of authorities will be profitless. The underlying principal that no man has a right to palm off his wares as those of another, thereby cheating the purchasing public and filching the business of a rival, is so essentially an element of natural justice and so solidly imbedded in our jurisprudence, that all that is necessary to quicken a court of equity, is to show that in the particular instance the offense has been committed." National Biscuit Co. v. Pacific CoastBiscuit Co., 83 N.J. Eq. 369. "The jurisdiction of courts of equity to prevent injury from infringement of trade names has been liberally exercised and applied in all circumstances whenever it appeared that the name was established, distinctive and valuable adjunct to an undertaking, whether used to distinguish manufactured articles, a place of business, or a corporation, commercial, or one formed not for pecuniary gain. All that is required to bring into activity the injunctive powers of the court, is to inform it that the complainant's trade is in danger of harm from the use of its name, by the defendant, in such a way as is calculated to deceive the public into the belief that the defendant's affairs, in the respect complained of are those of the complainant." Cape May Yacht Club v. Cape MayYacht and Country Club, 81 N.J. Eq. 454. It is not necessary that the complainant in order to succeed should prove actual fraud by the defendant, or that any single person was deceived. It is sufficient if in the opinion of the judge the symbol or device or get-up used by the defendant is one which so closely resembles the symbol, device or get-up used by the complainant as to be likely to deceive the public. If so, then the conditions required by the rules of law are fulfilled, and the decision of the question is one which must be committed to the eye and the sound judgment of the judge to whom the case is presented.Rubber and Celluloid Harness Trimming Co. v. Rubber-BoundBrush Co. et al., Ibid. 419; affirmed, Ibid. 519. "The idea that a *Page 318 
man has a right to use his name as a part of the name of a corporation in which he is interested, without regard to the effect of such use in the way of accomplishing deception and fraud, precisely as a natural person can use his own name, has I think, in this state, been exploded." Vice-Chancellor Stevenson, in L. Martin Co. v. L. Martin Wilckes Co., supra, citingInternational Silver Co. v. William H. Rogers Corp., supra.
In Singer Manufacturing Co. v. June Manufacturing Co.,163 U.S. 169, it was said: "Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied with any precaution or indication, in itself amounts to an artifice calculated to produce the deception." While a personal name may not constitute a technical trade mark, yet where an article has come to be known by that personal name, one may not use that name, even though it be his own, to palm off his goods as the goods of another who has first adopted it, and by which appellation the goods have come to be known, when the use of his own name for such purpose works a fraud. If he uses his own name it must be so used as not to deprive others of their rights, or to deceive the public, and the name must be accompanied with such indications that the thing manufactured is the work of the one making it as would unmistakably inform the public of the fact. Singer Manufacturing Co. v. JuneManufacturing Co., supra.
I find in this case neither laches nor acquiescence. The moment the defendant incorporated in 1918 under the name of Joseph Hollander Son, protest was entered against the use of the name "Hollander." Thereupon the corporate name was changed to "Jos. Hollander, Incorporated," at which time it was understood that whatever acquiescence there was on the part of the complainant to the use of the name "Hollander" by defendants in the new firm, was limited to keeping their business within the immediate trade and the understanding that defendants do not reach out to the consumer. That action on the part of complainant amounted to license which terminated upon the breach by defendants of the condition *Page 319 
upon which the license was granted. Moreover, it seems to me that neither acquiescence, if such there was, nor laches, is in the instant case a bar to injunctive relief, although it is a bar to the right of accountings for profits earned by defendant during the period of such acquiescence or laches. The property right in a name is not lost except by abandonment or express agreement of surrender. Here there is no evidence of surrender or abandonment on the part of complainant of the use of its name.
In McLean v. Fleming, 96 U.S. 245, "McLanes Liver Pill" had been sold on the market when the defendant marketed its pills under the name of "Dr. McLean's Universal Pills" and similar names. The defendant had been engaged in preparing and selling his pills for more than forty years during more than half of which period he had been using labels and trade-marks corresponding with those used by the predecessors of the complainant, and during which time all or most of them knew of the labels and trade-marks used by the defendant. Negotiations took place at one time between the defendant and one of the predecessors of the complainant with a view that both commodities might be sold at each of their respective places of business. The court held: "Acquiescence of long standing is proved in this case, and inexcusable laches in seeking redress, which show beyond all doubt that the complainant was not entitled to an account nor to a decree for gains or profits; but infringement having been proven, showing that the injunction was properly ordered, he is entitled to the costs in the circuit court; but the decree for an account and for the supposed gains and profits being erroneous, the respondent, as appellant, is entitled to costs in this court. Decree as to the injunction and costs in the circuit court will be affirmed, but it will be reversed as to the decree for an account and as to the allowance for gains and profits, * * *."
The rule in the McLean Case became the rule in the district of New Jersey and was adopted in Consolidated Fruit Jar Co. v.Thomas (Federal case No. 3131), 6 Federal Cases 341; N.J.L.J.272, in which Judge Nixon said: "There *Page 320 
has been large discussion of the question how far laches in stopping the infringement of a trade-mark will deprive a complainant of the benefits of a preliminary injunction. But that discussion has been put to rest so far as this court is concerned, by the recent decision of the supreme court in the case of McLean v. Fleming, where it was held that acquiescence of long standing was no bar to an injunction, although it precluded the party acquiescing from any right to an account for past profits." In Menendez v. Holt, 128 U.S. 514,
Chief-Justice Fuller said: "Counsel in conclusion earnestly contends that whatever rights appellees may have had were lost by laches; and the desire is intimated that we should reconsiderMcLean v. Fleming, supra, so far as it was therein stated that even though a complainant were guilty of such delay in seeking relief upon infringement as to preclude him from obtaining an account of gains and profits, yet, if he were otherwise so entitled, an injunction against future infringement might properly be awarded. We see no reason to modify this general proposition, and we do not find in the facts as disclosed by the record before us anything to justify us in treating this case as an exception. The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. * * * Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder, * * * nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right. * * * Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the *Page 321 
silence from which it springs; it is, in reality, no more than a revocable license." To the same effect is Aunt Jemima Mills Co.
v. Rigney Co., 247 Fed. Rep. 407. In International SilverCo. v. Wm. H. Rogers Corp., 66 N.J. Eq. 140, Vice-Chancellor Stevens, relying upon McLean v. Fleming, supra, said: "A clear distinction is made in all the cases, English and American, between the right to an injunction and the right to profits." He was there considering a bill for infringement and unfair competition and held: "It" (complainant) "should not be permitted to stand by, knowing that defendant is devoting its money and efforts to building up a business; wait until after he had made profits, and then come in and demand them as its own." On appeal from the vice-chancellor's decision the granting of the injunction and the refusal to allow profits were both approved by the court of errors and appeals. 67 N.J. Eq. (at p. 647).
In Blue Goose Auto Service, Inc., v. Blue Goose SuperService Station, Inc., 110 N.J. Eq. 547, Mr. Justice Parker, speaking for our court of appeals, said: "The refusal of relief on the ground of laches is untenable. It is generally settled that laches will not bar relief against future infringement and unfair competition, though it may bar an accounting of past profits. 38 Cyc. 881. If our own cases do not expressly lay down this rule, it is still implicit in several important decisions." Citing International Silver Co. v. Wm. H. RogersCorp., 67 N.J. Eq. 646, and other cases.
Acquiescence, therefore, is not a bar to injunctive relief where, as here, complainant seeks no account for profits made by the defendant during the period of alleged laches and acquiescence. Whether or not complainant is entitled, under its prayer for general relief, to an accounting for profits since it commenced its protests in 1933 is not necessary at this time to consider. Should such limited profits be claimed that circumstance will not affect the point under discussion, for acquiescence terminated when protest commenced.
The defendants resist the allowance of preliminary restraint and urge upon the court the authority of Citizens Coach Co. v.Camden Horse Railroad Co., 29 N.J. Eq. 299. *Page 322 
That high authority is too often urged under a misapprehension of its applicability. That case lays down three rules governing the issuance of preliminary injunctions. Those rules and the requirements of that case have been fully met by the proof presented in the instant case.
The Citizens Coach Case holds (1) that a preliminary injunction will not be granted unless there be presented some urgent necessity. In other words, the injury sought to be restrained must be, from an equitable point of view, irreparable in its nature. That is the situation in the instant case. To permit the defendant to continue until final hearing the simulation of complainant's trade-name would work an irreparable injury. The defendant would be permitted to attract away by its conduct much of complainant's custom and much of the benefit of complainant's extensive advertising and of its high reputation in the industry. The extent of such injury is in its very nature unascertainable and, even if ascertainable, not adequately compensable in money damages. The cases are legion where under like risk of injury complainant was awarded preliminary relief. Of the cases in our own state only one need here be mentioned, that of United Cigar Stores Co. v. United Confectioners,92 N.J. Eq. 449, wherein in sustaining a preliminary mandatory injunction, our court of errors and appeals said:
"Under these circumstances, we think the likelihood of irreparable injury was sufficiently imminent to justify such a mandatory injunction before final hearing as was here issued. Every week of delay enabled defendants to attract away from complainants by the false representations held out by this imitation more and more of complainants' customers and more and more of the benefit of complainants' advertising and of their high reputation. On the other hand, what the decree required the defendants to do can easily be done, and also should the injunction be dissolved on final hearing, undone, without much difficulty or undue expense. Defendants can easily paint in again the `United' shield and the red band, and the various other similar devices which the preliminary injunction requires them to remove, but the *Page 323 
good-will of an established business once diverted to a competitor can, in a great many cases, never be reclaimed or restored."
The Citizens Coach Case holds (2) that preliminary injunction should not issue if complainant's right depends upon an unsettled rule of law or upon some principle unsupported by the decisions of our own courts. In that case the court points out that the complainant's claim had not received "as yet, any support in any decision made by any judicial tribunal in this state," and that claims of like nature had been repudiated in other jurisdictions. In the case at bar the principles of law underlying the complainant's claim to relief are anciently settled and have for a great many years been deeply imbedded in our own law by decisions not only of this court but of the court of last resort.
The Citizens Coach Case holds (3) that where the defendant has directly, emphatically and circumstantially denied every material allegation of complainant's bill and proofs, the preliminary injunction should be withheld. In the case at bar there is not present such denial as is contemplated by the authority quoted. The denial is not complete nor is it circumstantially borne out. Certain it is that the defendants' proofs are far from being persuasive in support of their denial. The undisputed exhibits, the defendants' admissions and their failure to controvert significant proofs adduced by the complainant, leave the court's mind free of doubt. In that posture of things the defendants' mere denial, though under oath, cannot be permitted to overcome the force of complainant's convincing proofs. To allow a defendant's denial, no matter how weak, unsupported and unconvincing, to prevail against the clearly preponderating evidence adduced by his adversary, would be tantamount to holding that the defendant's complete denial under oath takes from the trial court the function of weighing the conflicting proofs and finding, for preliminary purposes, where lies the truth. Such an arbitrary and mechanical result could never have been contemplated by the pronouncement in theCitizens Coach Case and the philosophy of that case forbids that it be given such *Page 324 
interpretation. Rather, it seems to me, the case requires and in fact has invariably received such interpretation and application as are consonant with the just end sought to be achieved.
I am now brought to the question of the measure of preliminary restraint to be allowed. While the proofs clearly establish that the individual defendant, Joseph Hollander, is the founder of the business of the corporate defendant and is its principal stockholder and its directing head and therefore, in a sense, may be said is doing business by the instrumentality of the corporation, yet it is not disputed that he is not in business solely for himself and in individual form. His activities in the fur industry are in his capacity as officer and agent of the corporate defendant and in promotion of its business. That being so, it is not necessary for the complainant's protection that Joseph Hollander, the individual defendant, be preliminarily restrained as prayed for. In this respect the case at bar differs from the Rogers Case (71 N.J. Eq. 560; 72 N.J. Eq. 933), where, after the Rogers company had discontinued its business, Rogers individually went into business on his own account. Should a like event come to pass with respect to Joseph Hollander, it will then be time enough for the complainant to seek its appropriate relief against Joseph Hollander, if complainant be then advised so to do. Joseph Hollander will be restrained until final hearing as an officer and agent of the defendant company from doing those things with respect to which the company itself is to be restrained.
The corporate defendant will be restrained from using in its fur dressing and dyeing business its corporate name or any other name of which "Hollander" is a component part, and this without any qualification. To permit the corporate defendant to use the name "Hollander" in its business, even if limited to the trade, would expose the complainant to the risk of the very injury it complains of, viz., the deception or confusion of the buying public concerning the identity of the defendant's product. It appears from the defendants' own proofs, submitted on a motion to modify the ad interim *Page 325 
restraint, that women purchasing fur garments are in the habit of having the inner lining opened to permit them to examine the reverse side of the fur skin. The defendant's trade-mark or stamp on the reverse side of the skin becomes thereby a direct message to the ultimate user. Then, again, to permit the defendant to use its rival's name within the trade puts it within the power of unscrupulous dealers and middlemen to misrepresent the defendant's product as that of complainant. Against such hazard complainant is entitled to be protected.
A preliminary injunction in accordance with the views herein expressed is awarded against both defendants.